Robert A. Rosette (admission pending)
Saba Bazzazieh
Nicole St. Germain
Chase Goodnight (admission pending)
ROSETTE, LLP
565 W. Chandler Blvd, Ste. 212
Chandler, AZ 85225
Tel: (480) 889-8990
rosette@rosettelaw.com
sbazzazieh@rosettelaw.com
nstgermain@rosettelaw.com
cgoodnight@rosettelaw.com

*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Lac Courte Oreilles Financial Services, LLC, Hummingbird Funds, LLC, Miinan Funds, LLC<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>Cane Bay Partners VI, LLLP, Dimension Credit (Cayman), L.P., Strategic Link Consulting, LP, Esoteric Ventures, LLC, InfoTel International Ltd, M. Mark High, Ltd., Kirk Chewning, David Johnson, Kim Anderson, Jay Clark, and DOES 1-20,<br><br>　　　　*Defendant*. | **Case No.**<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **COMPLAINT**

Plaintiffs Lac Courte Oreilles Financial Services, LLC ("LCOFS"), a wholly-owned and

operated entity of the Lac Courte Oreille Band of Lake Superior Chippewa Indians ("Tribe"), a

federally-recognized tribe, and its wholly-owned subsidiaries, Hummingbird Funds, LLC

("Hummingbird") and Miinan Funds, LLC ("Miinan"), bring this complaint against David Johnson and Kirk Chewning, the co-owners of Cane Bay Partners VI, LLLP ("Cane Bay"), and their co-conspirators Dimension Credit (Cayman), L.P. ("Dimension Credit"), Strategic Link Consulting, LP ("Strategic Link"), Esoteric Ventures, LLC, d/b/a Max Touch Services ("Esoteric"), InfoTel International Ltd., d/b/a Voyse International ("InfoTel"), M. Mark High, Ltd., John Clark, Jay Clark, and Kim Anderson (collectively, "Defendants"). The Court's prompt intervention is required to enjoin and remedy years of Defendants' predatory and collusive business practices against the Tribe and its business entities. Defendants' continued unlawful actions cannot continue and for the reasons stated herein, this Court should find accordingly.

## NATURE OF THE ACTION

1.      This action arises out of Defendants' years-long effort to prevent the Tribe and its employees from taking rightful control over its businesses, converting millions of dollars from Plaintiffs—funds that should have been available to support important tribal governmental services.

2.      Kirk Chewning, through Cane Bay and Dimension Credit, orchestrated a scheme to exercise de facto control over the Tribe's lending businesses to facilitate an illegal lending enterprise and charge consumers up to 730% annual interest for loan. Defendants, playing on the Tribe's desperate desire to diversify its limited economy by creating new opportunities and governmental support for its people, held themselves out as industry experts and successful businessmen willing to consult on the development of, and provide services for, the Tribe's lending venture. However, unbeknownst to the Tribe, Chewning and Cane Bay really sought the framework of a thinly-veiled, carefully structured "rent-a-tribe" scheme — a business that was

tribally owned and operated on paper, but in reality, merely a front for non-tribal companies and individuals to continue their illegal offshore operations and skim money from the Tribe.

3.      In 2020, when Plaintiffs sought to exercise greater control over the operations of their own business, and demanded accountability and transparency with the services provided pursuant to the contractual relationship between the parties, Defendant Chewning began a malicious pursuit to first erode the value of the Tribe's portfolios, then  threaten to put Plaintiffs out of business, then refuse to perform services while also refusing to provide Plaintiffs with access to their own asset and intellectual property. Most recently, grasping for leverage, Defendant Chewning then urged Plaintiffs' capital source, Dimension Credit, to concoct an implausible story about interest rate increases, call Plaintiffs' note, and plan an embarrassing legal strategy to maintain a pretense of clean hands.  All of these efforts were geared toward maintaining Defendant Chewning's control and allowing Defendant Chewning to bleed the Tribe's asset dry.

4.      Over the course of the last year, when LCOFS Chief Executive Officer Scott Soli directly confronted Defendant Chewning with incorrect billing, inflated and unsubstantiated expense reimbursement demands, Defendant Chewning initially worked cooperatively with Plaintiffs to remove some entries and correct several material falsities with bills sent to Plaintiffs.  However, when Plaintiffs confronted Defendant Chewning with the scale of Defendants' misrepresentations, Defendant Chewning changed tone, demanded full payment of outstanding expenses and refused to provide access to Plaintiffs' own data to operate its business in violation of the parties' contractual relationship.  Defendants Cane Bay, Strategic Link, InfoTel, Esoteric, and M. Mark High demanded full payment and liquidated damages from Hummingbird and Miinan.

3

5.      At the same time, and in abject bad faith, Defendant Chewning sought to have Dimension Credit call Plaintiffs' loan, which it did in late May 2022.   Dimension Credit, pretending that it is uninvolved and in some fantastical dreamland comes to this action with clean hands, refused to participate in global mediation, claiming it has nothing to do with the dispute with Defendant Chewning and his entities.   In the wake of this continued and egregious conduct, Plaintiffs were forced to initiate the instant action.

## THE PARTIES

6.      Plaintiff Lac Courte Oreilles Financial Services, LLC is a limited liability company formed under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.  Its wholly-owned subsidiaries, Hummingbird and Miinan, own portfolios of unsecured online consumer loans originated under Tribal law.

7.      Defendant Kirk Chewning is an individual residing in St. Croix in the U.S. Virgin Islands.  He is the co-owner and officer of Defendant Cane Bay Partners VI, LLLP.

8.      Defendant David Johnson is an individual residing in St. Croix in the U.S. Virgin Islands.  He is the co-owner and officer of Defendant Cane Bay Partners VI, LLLP.

9.      Defendant Cane Bay Partners VI, LLLP is a limited liability partnership based in the U.S. Virgin Islands.   Cane Bay is owned and controlled by Defendants Chewning and Johnson.

10.      Defendant Strategic Link Consulting, LP is a limited partnership based in the State of Texas.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

11.      Defendant Esoteric Ventures, LLC, d/b/a as Max Touch Services is a limited liability company based in the State of Utah.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

4

12.     Defendant InfoTel International, Ltd., d/b/a Voyse International is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

13.     M. Mark High, Ltd. ("M. Mark High"), is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

14.     Defendant Dimension Credit (Cayman), LP is a limited partnership based in the Cayman Islands.  Upon information and belief it is owned and controlled, directly or indirectly, by Kirk Chewning.

15.     Defendant Jay Clark is an individual residing in Georgia and serves as Chief of Staff to Cane Bay as well as General Manager and CFO of Defendant Strategic Link.

16.     Defendant Kim Anderson is an individual residing in Georgia and serves as the Chief Executive Officer for several of the co-conspirators' auxiliary loan servicer entities.

## JURISDICTION AND VENUE

17.     The Court has original jurisdiction over this action pursuant to 18 U.S.C. § 1964 because Plaintiffs' raise violations under 18 U.S.C. § 1962.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1331, as this dispute arises under federal law.  The Court has jurisdiction over the remaining causes of actions in this Complaint on the basis of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

18.     This Court may grant the injunctive and declaratory relief sought pursuant to 28 U.S.C. §§ 2201-02.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

20.     The Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Tribe") is a federally recognized Indian tribe located in rural Wisconsin.  Thousands of the Tribe's membership live on the Reservation.  In addition to government services, the Tribe provides employment for members and the community and is the single largest employer in Sawyer County.  Because the area is without a significant nearby population, the Tribe's gaming endeavors have yielded modest returns.  Consequently, governmental services are limited, and Tribal members have unmet needs in the community.

21.     In hopes of improving their economy and providing comprehensive governmental services, the Tribe became interested in pursuing an online consumer lending venture. Eventually, the Tribe created LCOFS pursuant to Tribal law, a Tribally owned limited liability company charged with developing and managing this new venture.

22.     After LCOFS's creation, the Tribe began searching in earnest for an experienced business partner who could help guide and develop their business.

23.     Around late 2012, the Tribe first met Defendants Chewning and Johnson, who held themselves out as successful businessmen with decades of industry experience. Ultimately, Chewning convinced the Tribe that it was a perfect match with minimal risk – as his business and its affiliates offered comprehensive loan servicing at every level of the enterprise, could train tribal members to take over call center operations, and would even provide financing to launch.

24.     Kirk Chewning is a native of the State of Michigan who has worked in the consumer finance industry for thirty years.  After working in more traditional banking roles, Chewning transitioned to the subprime consumer lending market, and began to launch, manage,

and run unsecured online consumer lending businesses. Chewning often touts his charitable works operated through Cane Bay's affiliate, Cane Bay Cares – a St. Croix non-profit seemingly used to reduce Chewning's income tax liability to negligible levels after benefitting from the significant tax relief already afforded Cane Bay and its principals through the U.S. Virgin Islands Economic Development Commission benefits.

25.     David Johnson is Chewning's business partner.  He is a wealthy investor who chose to move to St. Croix with Chewning to take advantage of income tax breaks associated with business development in the Virgin Islands.  Together, Chewning and Johnson have a history of off-shore online lending management and together have made millions of dollars through the exploitation of impoverished Indian tribes across the country.  As a testament to Johnson's pride in his offshore and unregulated forays in payday lending, he christened one of his yachts the "Renewed Interest."

26.     In 2009, Johnson and Chewning organized Cane Bay in the U.S. Virgin Islands for the purpose of evading state and federal income tax laws, and to facilitate the growth of their consumer lending business ventures.  Johnson and Chewning previously owned and operated Hong Kong Partners, a company organized in Belize, for the purpose of operating offshore consumer lending businesses and funding payday loans to American consumers and charging them in excess of 700% annually.  Lending through a foreign entity afforded Defendants Chewning and Johnson some protection from liability and made it notoriously difficult for consumers to have any kind of meaningful recourse.  Similarly, Defendants asserted that because these businesses were foreign, they were not subject to federal consumer protection laws.  However, as offshore lenders became subject to more significant scrutiny from state and federal regulators, Defendants Chewning and Johnson knew they needed to diversify their

holdings.

## THE INITIAL BUSINESS RELATIONSHIP

27.     In 2013, Chewning met with the Tribal Governing Board, the Tribe's governing body, and traveled to Hayward, Wisconsin to present his business operation, his proformas, and his plans for material changes lending could make to the Tribal community.  Following that meeting, the parties negotiated a deal for the servicing and oversight of the Tribe's start-up consumer lending portfolio, Oasis Funds, LLC.  Chewning pitched Cane Bay and its affiliate servicing companies (Strategic Link, Esoteric, InfoTel, M. Mark High, Ltd. – the "Servicing Affiliates") as a full-service suite that would provide everything from underwriting expertise, call center coverage, training for Tribal employees, and, notably, access to credit.  Chewning represented to the Tribe in negotiations that he also had access to credit through his affiliate business, Dimension Credit, a Cayman Islands fund that Chewning represented he owned and controlled.  Concurrently with the negotiation of the transaction documents with Cane Bay and the Servicing Affiliates, the Tribe was also presented onerous loan documents from Dimension Credit.  Chewning represented to the Tribe that Dimension Credit was unwilling to materially alter the template documents provided.

28.     Notably, Chewning reinforced his control over the Tribe's new business enterprise by conditioning financing from Dimension Credit on LCOFS selecting Cane Bay as its servicer.  The Credit Agreement with Dimension Credit required LCOFS and its subsidiary, Hummingbird, to maintain its contractual relationship with Cane Bay and the Servicing Affiliates or be in immediate default of the loan. Worse yet, this arrangement included a sweeping security interest where any default would trigger a transfer of all rights and interests in Hummingbird Funds from LCOFS to Dimension Credit, including a pledge of the equity of

LCOFS – effectively stripping LCOFS and Hummingbird of its status as tribal entities at Dimension Credit's election.

29.     Dimension Credit, Cane Bay, and Defendant Chewning acted in concert to ensure the finalization and signature of the Cane Bay services agreement along with the Dimension Credit loan documents to ensure that Defendant Chewning would be able to exercise control over the Tribe's operation, cash flows, business decisions, and cash distributions. Defendant Chewning represented that the Dimension Credit board of directors showed him great deference, and LCOFS should take heart, because Cane Bay's and the Tribe's interests were aligned.  The Tribal Governing Board relied on his representations and mitigated the Tribe's risk.

30.     Plaintiff LCOFS finally concluded negotiations on servicing documents and LCOFS finalized and signed transaction documents with Cane Bay and the Servicing Affiliates in 2014 for a five-year term.  The resulting lending company's portfolio, Oasis Funds, launched shortly thereafter.  Despite the projections and Chewning's pro forma, the Tribe earned the bare minimum while Cane Bay took a significant cash sweep.

**RENEGOTIATIONS AND RESTRUCTURE**

31.     From 2014-2017, the parties operated under the terms of the original 2014 agreements.  In mid-2017, Plaintiffs desired to renegotiate terms with Cane Bay and Dimension, as it believed the Tribe was disadvantaged in the relationship with respect to economics and employment opportunities.  Plaintiffs believed – and communicated to Cane Bay and Chewning personally – that the Tribe had not recognized the benefit of the bargain as represented by Chewning with respect to portfolio growth, earned profits, or increasing employment opportunities on the Reservation.

32.     Plaintiffs were forced to strongarm Defendant Chewning and his companies to the table to renegotiate their relationship.   After a year of negotiating and Plaintiffs communicating that the Tribe was willing to walk away from the relationship entirely, Defendant Chewning, Cane Bay, and the Servicing Affiliates offered to restructure the transaction, train and develop Tribal members to take over more significant business components, and paid the Tribe $1.8 million upfront to fund its elders program, child care, indigent burial services, and a victims of domestic violence shelter as consideration for the longer 9.25 year term Cane Bay demanded in the new transaction.

33.     Notably, the Dimension Credit note was set to mature during this time period. Defendant Chewning had previously taken steps—without the permission of the Plaintiffs—to try to broker an amendment to the Dimension Credit facility in 2016 that increased the interest rate from 15 to 20%.   Plaintiffs never signed because they did not believe it was in their business interest.

34.     However, unbeknownst to Plaintiffs at the time, and without any contractual obligation to do so, Defendant Chewning began to transfer funds from Hummingbird and Miinan bank accounts to make interest payments to Dimension Credit at 20% in September 2016, resulting in years of overpayments that, pursuant to the transaction documents, must be credited toward principal repayment of the facility.

35.     During negotiations for a restructure of the Cane Bay relationship, Plaintiffs looked to Defendant Chewning to negotiate an extension of the note to run concurrent with the new Cane Bay term.   Defendant Chewning represented to Plaintiffs that he would use best efforts, but that the loan was already mature, and he was confident that Dimension Credit trusted Defendant Chewning so much that it would continue to extend credit under the existing

10

documents whether the loan had technically matured or not.  The note matured in 2016, and Dimension Credit did not exercise its right to call the loan.

36.     Plaintiffs believed the changes to the relationship, particularly the restructure of the economics to the Tribe, would help ensure the Tribe received both more profit to fund government programs and provide significant gains in Tribal employment opportunities.  In November 2018, in reliance on Defendant Chewning's representations that this new structure would drive Tribal economic growth and increase operational control, Plaintiffs signed new transaction documents to restructure the relationship.

37.     Unfortunately, instead of beginning the new term with a clean slate, upon information and belief, Defendant Chewning, Cane Bay, and the Servicing Affiliates secretly overhauled the manner in which the companies expensed Plaintiffs to back-into the service fees and revenue numbers Cane Bay and the Servicing Affiliates made under the prior contractual relationship.  Though the plain language of the agreements said otherwise, the impact of this accounting change effectively maintained the economic status quo for Defendant Chewning, Cane Bay, and the Servicing Affiliates.

38.     To minimize the profits available to Plaintiffs for distribution, and to increase alleged operating expenses of Hummingbird and Miinan, Defendant Chewning, controlling Cane Bay and the Servicing Affiliates, billed the costs of Servicing Affiliates' fixed assets to Hummingbird and Miinan.  Chewning also began attempting to pass impermissible expenses on to Plaintiffs, most egregiously, the costs associated with defending a Servicing Affiliates' lawsuit brought by an aggrieved Belizean call center employee, in excess of $35,000.  It became apparent to Plaintiffs that Defendant Chewning regarded himself as de facto CEO of Hummingbird and Miinan with the authority to use Tribal assets to pay his own expenses at his

sole discretion.

39.     In February 2020, Plaintiffs hired Scott Soli as the Chief Executive Officer of LCOFS, giving him direct oversight and control over Hummingbird and Miinan.   Upon performing an internal audit of business operations, Mr. Soli immediately identified several irregularities in financial statements and performance metrics.   He noted that the negotiated employment training meant to bolster the on-Reservation call center had been a financial boon for Cane Bay's affiliates – because LCOFS paid the entirety of their costs – while it resulted in zero additional jobs and no further development of the Tribe's call center authority.

40.     Mr. Soli asked Defendant Chewning why this training had proven so ineffective when it was so costly.  Defendant Chewning claimed the Tribal members were untrainable.  Mr. Soli also inquired as to why Tribal employees were being trained on the most difficult aspects of in-house collections.   Mr. Soli believed it was because Defendant Chewning had simply created a ruse to pacify the Tribe by including Tribal members in a non-material aspect of the business, with collection efforts that set the on-Reservation call center up for failure.

41.     Meanwhile, throughout the course of the relationship, Cane Bay oversaw cash management for Plaintiffs in a way that materially disadvantaged Plaintiffs and maximized profit distributions to Cane Bay.  For example, prior to Mr. Soli's hiring, and under the guise of providing long term cash management and portfolio growth projections for Plaintiffs, Defendant Chewning deferred $10 million in accounts payable owed by Hummingbird and Miinan. Deferring such payments allowed Cane Bay to take a larger cut of portfolio revenues on a monthly basis as a "success fee."  However, when the deferred payment balance ballooned to $10 million, Defendant Chewning approached Plaintiffs and advised them that they must draw additional revenue down from the expired Dimension Credit facility to satisfy the outstanding

payables.  Despite having cash on hand to pay expenses in the ordinary course, Defendant Chewning purposely deferred due and owing payments so as to sweep more cash for himself and to weaken Plaintiff's equity and cash position.

42.     Notably, this served Defendant Chewning in two ways – it increased profits derived by and paid to Cane Bay and it increased his return on investment through additional interest owed to Dimension Credit, in which he held a financial interest.  Plaintiffs were forced to draw down on the Dimension Credit facility to sustain Hummingbird and Miinan.  Despite Defendant Chewning's representations, deferring accounts payable to supposedly grow the size of the portfolio proved unsuccessful and neither Hummingbird nor Miinan saw a material change in profits from this business decision.

43.     After his hire, Mr. Soli began to require Defendant Chewning to communicate directly with Mr. Soli, not individual Tribal members, because Defendant Chewning sought to poison the Tribe's opinion of Mr. Soli and his efforts.  Mr. Soli made multiple communication attempts to understand and remediate the strategic and financial problems Plaintiffs were suffering.  Mr. Soli was rebuffed and belittled.  However, with persistent follow up, Defendant Chewning was forced to admit that Cane Bay and the Servicing Affiliates had made mistakes on the way they charged certain costs to Hummingbird and Miinan.

44.     Over the course of the next year, Mr. Soli worked diligently to wrest control over call center operations and credit decisioning back to the Tribe as set forth in the transaction documents.  The parties negotiated multiple amendments to the Service Level Agreements between Hummingbird and Miinan and the Servicing Affiliates to right certain wrongs Mr. Soli had uncovered and articulated.  Yet, at every turn, Defendant Chewning deliberately acted to prevent meaningful advancements for the Tribe.  Over time, it has become apparent that the

13

Defendants never intended to aid the Tribe in its economic pursuits in any meaningful way. It simply wanted nearly a decade of revenues derived in the Tribe's name by continuing their "rent-a-tribe" scheme.

45.     However, upon Mr. Soli's insistence, the Tribe hired more on-Reservation call center employees and took over verification and funding calls, along with soft collections for Hummingbird and Miinan's customers. Despite Defendant Chewning's beliefs about the Tribal call center's abilities, on-Reservation employees have facilitated the collection of over $5 million in active loans since Mr. Soli's hiring. Based on this success, Plaintiffs concluded that Defendant Chewning's efforts to prevent the Tribe from gaining experience or expertise in this aspect of the lending business were solely to preserve his profits from Plaintiffs' businesses.

46.     Defendant Chewning would threaten Mr. Soli (and later individual Tribal leaders when Mr. Soli ignored Mr. Chewning's theatrics) with moving Cane Bay's expertise to its other tribal relationships. Defendant Chewning routinely told Plaintiffs that the Tribe would do well to remember that it would have nothing without Cane Bay's generosity. He represented that without Cane Bay, the Tribe would have nothing.

47.     Defendant Chewning had the wherewithal to make good on such a threat discretely. As is well-documented in multiple class action lawsuits, Cane Bay has a contractual relationship with other tribes, including the Three Affiliated Tribes, whose lending portfolios charge consumers in excess of 700% interest annually. Upon information and belief, Defendant Chewning acted to route quality purchased consumer applications ("leads") away from Plaintiffs and to its other tribal portfolios where Cane Bay and the Servicing Affiliates enjoyed better economics and less oversight. The foreseeable and actual result of this bad faith behavior was to degrade the quality of consumer loans comprising Plaintiffs' portfolios and leading to

the gradual decline in value of the portfolios through loan defaults and charge-offs. These actions directly and proximately caused the devaluation of Plaintiffs' portfolios and the gradual wind-down of both portfolios. Defendants' conduct resulted in the material decrease in profits available for distribution to the Tribe while it maintained the fixed fees earned by Cane Bay and the Servicing Affiliates.

48.     Conflict between Mr. Soli and Defendant Chewning reached a fever pitch in early 2022 when Mr. Soli expressed Plaintiffs' desire to operate without Cane Bay, the Servicing Affiliates, and their bad faith conduct. He proposed, in writing, that Defendant Chewning make an offer for the buyout of the contracts. Defendant Chewning agreed he would put together a proposal.

49.     In May 2022, growing frustrated with Mr. Soli's demand for expense justification and operational autonomy, Cane Bay and the Servicing Affiliates, through counsel, notified Plaintiffs formally of a dispute and their intent to mediate as set forth in the parties' transaction documents. The comically one-sided rendition of the facts did not mention the parties' months-long negotiation related to improper expenses or Defendant Chewning's representations that he would present a number for a buy-out of the contracts. Instead, counsel noted that the contracts contemplate an early termination liquidated damages clause. All in all, counsel for Cane Bay and the Servicing Affiliates made a multi-million dollar demand not based in reality.

50.     Following receipt of Cane Bay's letter, Plaintiffs employees required portfolio data held and controlled by Strategic Link. Specifically, LCOFS sought past financials, bank statements, and aggregate bad debt write-off calculations. Strategic Link refused to cooperate with any requests and noted that it would not act under the terms of the contracts until all

outstanding expenses and invoices were paid.  Strategic Link also informed Hummingbird and Miinan that it had ceased purchasing leads for the portfolios, meaning the Servicing Affiliates would not assist in underwriting or funding any new loans for either portfolio.

51.     In an effort to create leverage for Cane Bay and the Servicing Affiliates, upon information and belief, Defendant Chewning then used his leverage with Dimension Credit to push Dimension Credit to call Plaintiffs' loan on or about May 23, 2022.  However, this too is convoluted by Defendant Chewning's malfeasance.  When Defendant Chewning demanded that Plaintiffs draw down an additional $10 million from the Dimension Credit facility to pay deferred payables in 2019, he also sought to negotiate (or potentially broker) another extension of the facility.   Dimension Credit and Plaintiffs were never able to come to terms, and no amendment was signed.

52.     Defendant Chewning represented to Mr. Soli on or about December 2021 that a change of control had occurred at Dimension Credit, and somehow Defendant Chewning (or his businesses) owed indemnification obligations to Dimension Credit.  Mr. Soli was unable to discern more information on how this could impact Plaintiffs, but did question Defendant Chewning about why Plaintiffs never received any notice of the change in ownership. However, the implication was that Defendant Chewning was personally motivated to get Plaintiffs to sign amended documents with Dimension Credit to limit his indemnification obligations he may owe to Dimension Credit.

53.     Despite the fact that the Dimension Credit transaction documents explicitly say that any amendment must be in writing, Dimension Credit alleges that there was an implied contract increasing the interest rate.   And now that Dimension Credit is calling the loan (because it can, not because of an actual default), supposedly Plaintiffs are obligated to the

16

interest rate Dimension Credit wishes it would have finalized.

54.    Goaded by Defendant Chewning, Dimension Credit now seeks to exercise its right under *some* version of the credit agreement and demands satisfaction of the loan. Plaintiffs provided Defendant Chewning with an executed copy of Dimension Credit's satisfaction and release of lien to remind his of the history between the parties.  Dimension Credit still believes it is entitled to millions and has threatened to pursue all rights and remedies to which it is entitled.

<u>COUNT ONE</u>

**EMBEZZLEMENT AND THEFT FROM A TRIBAL ORGANIZATION**
**18 U.S.C. § 1163**
**[Against Defendants Cane Bay, Kirk Chewning, and David Johnson]**

55.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

56.    It is undisputed that the Tribe is a federally-recognized Indian tribe and LCOFS is a wholly owned entity of the Tribe, as are its subsidiaries Hummingbird and Miinan.

57.    Defendants Chewning, Johnson, and Cane Bay each arranged for and/or participated in the creation of the relationship between the parties to provide a mechanism for Defendants to extract profits that should have otherwise been available or Tribal distribution, to instead enrich themselves by collecting on loans whereby they charged consumers up to 730% interest annually.

58.    Defendants have violated 18 U.S.C. § 1163 by embezzling, stealing, knowingly converting, and/or otherwise misappropriating the Tribe's economic benefit from Plaintiffs.

59.    Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities.  Defendant Chewning acted directly, on behalf of

17

himself and Cane Bay, to misrepresent the nature of the restructured transaction and the way expenses would be billed, and to deny and restrict Plaintiffs from access to their assets, intellectual property, and regular business operations.  Cane Bay acted to prioritize the payment of Cane Bay "success fees" instead of Plaintiffs' due and owing accounts payable.

60.     Defendants are also jointly and severally liable to Plaintiffs due to their collusive actions and role in defrauding the Plaintiffs.

61.     Defendants caused to be stolen from Plaintiffs an amount to be determined at trial. Given the nature and scope of control and bad acts over the course of the relationship, Plaintiffs estimate this amount to be in excess of $250 million.  In 2019 alone, Hummingbird paid Cane Bay and the Servicing Affiliates over $57.5 million.

<u>**COUNT TWO**</u>

**AIDING AND ABETTING EMBEZZLEMENT AND THEFT FROM TRIBAL ORGANIZATION**
**[Against All Defendants]**

62.     Plaintiff realleges and incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

63.     Defendants each played a key role in causing the embezzlement, theft, conversion, and/or misappropriation of assets from Plaintiffs, including by providing material business and logistical support.   As co-owners of Cane Bay, Defendants Chewning and Johnson, both individually and personally benefited from the theft of Tribal assets.

64.     In aiding and abetting the embezzlement, theft, conversion, and misappropriation of Plaintiffs' assets, Defendants knowingly and willingly intended to direct the assets and property of a federally-recognized Indian tribe to their own possession and use.

65.     Defendants' fraudulent actions made each of them individually liable as alter

18

egos of their respective corporate entities.

66. Defendants are also jointly and severally liable to Plaintiffs due to their collusive actions and role in defrauding the Plaintiffs.

## COUNT THREE

### VIOLATIONS OF RICO
### 18 U.S.C. § 1962
### (WIRE FRAUD)
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, and Does 1-20]**

67. Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

68. Defendants Cane Bay, Kirk Chewning, and David Johnson are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

69. Defendants Cane Bay, Kirk Chewning, David Johnson, and Kim Anderson comprised an "enterprise" as that term is defined in18 U.S.C. § 1964(3), associated for the common purpose of profiting off of the collection of unlawful debt, without control of the Plaintiffs, through loans made to borrowers throughout the United States.

70. In association with this enterprise, Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, along with other participants not yet known to Plaintiffs, violated 18 U.S.C. § 1962 by engaging in a pattern of "racketeering activity" including through wire fraud as defined in 18 U.S.C. § 1343.

71. Defendants Cane Bay, Kirk Chewning, David Johnson and Kim Anderson have engaged in wire fraud by devising and implementing a scheme to defraud Plaintiffs and obtain money from Plaintiffs' accounts by means of false and fraudulent pretenses.

72. In furtherance of their rent-a-tribe scheme, Defendants Cane Bay, Kirk Chewning, David Johnson, and Kim Anderson transmitted, or caused to be transmitted, by

means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

    a.  Interstate communications via email, telephone, facsimile, and/or other means.

    b.  Interstate transfers of funds to and from Plaintiffs' customers, with the overall intent of furthering the rent-a-tribe scheme and thus enriching themselves.

    c.  Interstate and international transfers of funds in the ordinary course of business to further the ongoing unlawful lending enterprise.

73.    Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities.

74.    Defendants are also jointly and severally liable to Plaintiffs for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

75.    As a direct and proximate result of Defendants' wire fraud in violation of RICO, Plaintiffs have been injured in its business and property in an amount to be determined at trial.

## COUNT FOUR

**VIOLATIONS OF RICO**
**18 U.S.C. § 1962**
**(MONEY LAUNDERING)**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Jay Clark, Dimension Credit, and Does 1-20]**

76.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

77.    Defendants Cane Bay, Kirk Chewning, David Johnson, and Dimension are each

a "person" as that term is defined in 18 U.S.C. § 1964(3).

78.    Defendants Cane Bay, Kirk Chewning, David Johnson, and Dimension Credit comprised an "enterprise" as that term is defined in 18 U.S.C. § 1964(3), associated for the common purpose of profiting off of the collection of unlawful debt, without control of the Plaintiffs, through loans made to borrowers throughout the United States.

79.    Defendants, through their enterprise, violated 18 U.S.C. § 1962 by engaging in a pattern of "racketeering activity" including through money laundering as defined in 18 U.S.C. § 1956.

80.    In furtherance of the RICO enterprise described herein, Defendants, knowing that funds involved represented the proceeds of unlawful racketeering activity, conducted, or attempted to conduct financial transactions which in fact involved the proceeds of their unlawful racketeering activity, including by concealing or attempting to conceal the nature, location, source, ownership, or control over the proceeds of the unlawful racketeering activity.

81.    Such financial transactions included disguising payments made to Defendants as payment of servicer and "consulting" services and expenses, facilitating and receiving the payment of interest in excess of the transaction documents between the parties without legal basis and without Plaintiffs' knowledge, and other compensation that effectively attempted to "rent" the Tribe's sovereignty for their own financial gain.

82.    Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities.

83.    Defendants are also jointly and severally liable to Plaintiffs for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

84.    As a direct and proximate result of Defendants' money laundering, Plaintiffs

have been injured in its business and property in an amount to be determined at trial.

## COUNT FIVE

### BREACH OF CONTRACT
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

85.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

86.     It is undisputed that on our around 2018, Plaintiffs entered into contracts with Defendants Cane Bay, Strategic Link, Esoteric, InfoTel, and M. Mark High to provide Plaintiffs' with services relating to its online lending portfolios.

87.     Upon information and belief, Defendants Cane Bay, Chewning, Johnson, Strategic Link, Esoteric, InfoTel, and M. Hark High, individually and collectively, took knowingly, willfully, and deliberately, took actions in breach of the contracts with the Plaintiffs, despite good faith efforts on the part of the Plaintiffs to adhere to the plain terms, as well as with the spirit and intent of the agreements.

88.     Defendants' actions, individually, and collectively constitute gross negligence, thereby resulting in breach of the contracts between the Plaintiffs and Defendants.  Such negligent acts include (but are not limited to):  negligence in servicing activities; dilution of the value of the Plaintiffs' asset; mismanagement of funds belonging to Plaintiffs; and failure to appropriately report revenue from Plaintiffs' operations to the Internal Revenue Service and other relevant agencies.

89.     As a result of Defendants' breach, Plaintiffs have suffered damages in the millions – representing prior, current, and future proceeds of Plaintiffs' business operations, as well as the diminished value of Plaintiffs' asset.

## COUNT SIX

**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

90.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

91.     The contracts entered into between Plaintiffs and Defendants all require that each party act in good faith toward the other party and to deal fairly with that party when performing the express terms of the contract.

92.     Defendants Cane Bay, Kirk Chewning, David Johnson and Strategic Link each had an obligation to use good faith in the execution of their duties as service providers to the Plaintiffs.

93.     Indeed, in negotiating and entering into the various agreements in 2018, Plaintiffs reasonably expected that the restructured relationship between the parties would result in the Plaintiffs realizing greater economic advantages from and control of business operations to ensure the Tribe received both more profit to fund government programs and provide significant gains in Tribal employment opportunities.

94.     In acting to improperly bill Plaintiffs for expenses and costs to which it was not obligated to pay, Defendants Cane Bay, Kirk Chewning and David Johnson acted in violation of their duty of good faith.

95.     In purposely deferring due and owing accounts payable so as to distribute success fees to Cane Bay to the detriment of Plaintiffs, Defendants Cane Bay, Kirk Chewning and David Johnson violated their duty of good faith.

96.     In refusing to comply with requests for access to Plaintiffs' own assets, including

intellectual property and systems, Defendants Cane Bay, Chewning, and Johnson violated their duty of good faith by seeking to hold hostage Hummingbird and Miinan in exchange for payment of invoices disputed in good faith.

97.    In acting to route leads away from Hummingbird and Miinan and to its other tribal portfolios, Defendants Cane Bay, Kirk Chewning and David Johnson violated their duty of good faith by degrading the quality of loans comprising Plaintiffs' portfolios and leading to the gradual decline in value of the portfolios.

98.    As a result, Plaintiffs have suffered significant damages - representing prior, current, and future proceeds of Plaintiffs' business operations, as well as the diminished value of Plaintiffs' asset.

**COUNT SEVEN**

**TORTIOUS INTERFERENCE WITH CONTRACT**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson]**

99.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

100.    To facilitate their operation of their business, Plaintiffs' had various third party agreements, including the agreement with Dimension Credit to provide capital to the portfolios.

101.    Through their improper and wrongful conduct, Defendants Cane Bay, Kirk Chewning and David Johnson, directly interfered with Plaintiffs' contractual relationship with Dimension Credit by forcing them to call Plaintiffs' loan on or about May 2022.

102.    Defendants' contractual interference is documented and it was intentional.

103.    There was a direct causal connection between Defendants' interference and the damages that Plaintiffs suffer and continue to suffer as a result of its multi-million dollar note suddenly being called for payment.

104.    Defendants had no right, privilege, or ability to interfere with this contractual relationship.

## COUNT EIGHT

### CONVERSION
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

105.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

106.    In acting to divert assets, data, and intellectual property belonging to the Plaintiffs, Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, Strategic Link, Esoteric, and InfoTel have knowingly and deliberately attempted to control or take Plaintiffs' property.

107.    Defendants' have acted in this manner without the Plaintiffs' consent and, indeed, in spite of Plaintiffs' adamant protests.

108.    Defendants' taking of Plaintiffs' assets have resulted in significant and serious interference with Plaintiffs' ability to control, possess, operate, and manage its business operations.

## COUNT NINE

### UNJUST ENRICHMENT
**Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

109.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

110.    Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric,

and InfoTel knowingly and deliberately took action to retrieve funds from Plaintiffs through fraudulent expense reports, improper cash management and oversight, and unjustified interest payments to Dimension Credit.

111.   Such improper revenue collection has resulted in an inequitable and unjust retention of funds that rightfully belonging to the Plaintiffs.  Defendants cannot and should not retain this benefit without compensating Plaintiffs for the value received to date.

## COUNT TEN

### INJUNCTIVE RELIEF
### [As to all Defendants]

112.   Plaintiffs have already suffered and will continue to suffer immediate and irreparable harm as a result of Defendants' wrongful actions

113.   There is no adequate legal remedy to compensate Plaintiffs for Defendants' actions.

114.   Defendants have no legal basis for its continued attempt to control and divert Plaintiffs' property.   Accordingly, Plaintiffs have a substantial likelihood of success on the merits.

## COUNT TWELVE

### DECLARATORY JUDGMENT
### [As to all Defendants]

115.   Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

116.   An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties.

117.    Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties with respect to the actions of the Defendants and the contracts at issue is both necessary and appropriate under the circumstances.

118.    Plaintiffs have no equally plain, speedy, or adequate remedy to prevent Defendants' actions other than seeking declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. Declaratory judgment that Defendants have violated RICO;

2. An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

3. Injunctive relief prohibiting Defendants from continuing their wrongful conduct;

4. Compensatory damages, in an amount to be determined at trial;

5. Treble, multiple, punitive, and/or exemplary damages, in an amount to be determined at trial;

6. Pre-judgment and post-judgment interest;

7. An order awarding Plaintiffs the costs of suit, including reasonable attorneys' fees as provided by law; and

8. Any other relief the Court, in its discretion, finds necessary and/or appropriate.

Respectfully submitted,

Dated: June 22, 2022

*/s/ Nicole St. Germain*
_____
Robert A. Rosette (admission pending)
Saba Bazzazieh
Nicole St. Germain
Chase Goodnight (admission pending)
ROSETTE, LLP
565 W. Chandler Blvd, Ste. 212
Chandler, AZ 85225
Tel: (480) 889-8990
rosette@rosettelaw.com
sbazzazieh@rosettelaw.com
nstgermain@rosettelaw.com
cgoodnight@rosettelaw.com

*Attorneys for Plaintiffs*